# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| v. | : CRIMINAL CASE NO.: |
| JOKELERA COPELAND | : 1:16-cr-00015-28-AT-JSA |

### ORDER AND REPORT AND RECOMMENDATION

This case is before the undersigned on the motion of Defendant Jokelera Copeland to Suppress Statements [355], which the Court **RECOMMENDS** be **DENIED**.

### I.   Background

This case is part of a large, multi-defendant action in which various inmates in and employees of certain Georgia state prisons, along with family members and other outside associates of inmates, allegedly conspired to smuggle contraband (including illegal cell phones) into the prisons.  Defendant Copeland was interviewed in connection with her duties as a Corrections Officer at Autry State Prison on three occasions in late 2015 and early 2016.  *See* Transcript [516] at 4.

At the conclusion of the evidentiary hearing on August 16, 2016, the Court expressed certain preliminary findings of fact on the record.  *See id.* at 31-34. Specifically, the Court preliminarily found that:

So based on Agent Hosty's testimony, he interviewed the defendant

twice, and then there was a third encounter during the arrest or the day of arrest where statements were made as well. The interviews were October 8th, 2015, and December 9th of 2015, both at the defendant's residence.

Agent Hosty was with another agent each time. In both interviews the defendant did not resist in speaking to them, but, also, there was no specific warnings given. And I'd infer that she wasn't specifically provided --well, she wasn't provided Miranda rights nor specifically warned or advised that she didn't have to speak. But according to Agent Hosty's testimony, she did not resist speaking and willingly -- well, I won't say willingly. That's a conclusion. But did not decline to speak until towards the end of the second interview in December when she specifically said she didn't want to talk anymore, which ended that interview.

On both occasions the agents were armed, although with holsters that were -- that obscured, covered the holster, but I do assume that it would have been evident to Ms. Copeland that they were wearing a weapon under their clothing from the -- Agent Hosty acknowledged there would have been a bulge, and Ms. Copeland, with her employment experience, very well may have assumed that they were armed.  And on the second occasion, they did have identifying information on their clothing as to being FBI. They also displayed identification showing that they were FBI on both cases, and in both cases the kindergarten daughter was present during the interview.

The third occasion, January 21st, 2016, was for purposes of the arrest. The defendant was arrested at her residence, placed into custody with handcuffs in the car. The -- she was not advised of her rights until several minutes after being placed into the car with handcuffs, although according to Agent Hosty's testimony, there was no questioning during that period, at least eight minutes of which it sounds like are covered by a recording. But there was no questioning, according to Agent Hosty, during the pre-Miranda rights advisement period. Any statements made were not the result of questioning, in other words, according to Agent Hosty's testimony. The defendant was placed with handcuffs behind her

back, which she initially complained were tight and Agent Hosty acknowledged were too tight. The tightness was resolved shortly after

> the arrest by moving to a new parking lot and addressing the tightness of the -- the defendant, however, was kept with the handcuffs behind her back for a period of time until they reached Cordele because according to Agent Hosty's testimony, she was -- the concern was as to her behavior, and she was not acknowledging that she would behave in the car. That was the reason why the handcuffs were kept behind her back. But then in Cordele she promised she would, and then they were moved to the front. Although Miranda rights were given and the defendant did not expressly invoke those rights during the course of the ride, there was no executed written waiver of rights either.

*Id.* Neither party has objected to or pointed the Court to any evidence contradicting those preliminary findings of fact. Thus, the Court adopts and refers to these findings of fact.

At the hearing, an audio recording of the three statements was offered into evidence and accepted as Exhibit 1. At the conclusion of the hearing, the Court set a deadline for the submission of a post-hearing brief by the Defendant, and the Court indicated that it would decide whether to order a responsive brief from the Government after receiving and reviewing the Defendant's brief, if any. [*Id.*] at 34-35. Because the parties chose to simply offer the recording into evidence, and not play any portion in open court, the Court ordered that the Defendant (and, if applicable, the Governnment) specifically point the Court to any parts of the recording on which the Court should focus. *Id.* The Defendant filed a post-hearing brief on September 23, 2016 [532]. The Defendant did not direct the Court's attention to any specific portions of the recordings but the Court has

nevertheless listened at least generally to those recordings, as discussed below. The undersigned has otherwise conclude that the adjudication of this motion does not require a Government response.

## II.  Discussion

If a Defendant moves to suppress her incriminating statements to law enforcement, the Government bears the burden to show that the Defendant's statements were made voluntarily. *See Jackson v. Denno*, 378 U.S. 368 (1964). Determining whether a statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. *United States v. Jones*, 32 F.3d 1512, 1516 (1994); *see Arizona v. Fulminate*, 499 U.S. 279, 285–88 (1991). The Eleventh Circuit has stated:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.

*Jones*, 32 F.3d at 1517 (quotation omitted).

Moreover, in *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that a suspect who is in custody must be advised of his right to remain silent and of his right to the assistance of counsel prior to any interrogation by law

enforcement. The Supreme Court also made clear that the Government has the burden to show the knowing and intelligent nature of a waiver. *See Miranda*, 384 U.S. at 475. Indeed, the Supreme Court made clear that "[if] the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests upon the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.*

The Supreme Court instructs us to look for two things in assessing this question:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quotation marks and citation omitted).

### A. The Non-Custodial Statements

As noted above, the Defendant spoke to the agents on two occasions in her home, on October 8, 2015 and November 9, 2015. The Defendant does not argue that she was subjected to custodial interrogation on these occasions, which is her

burden to show. *United States v. de la Fuente*, 548 F. 2d 528, 533 (5th Cir. 1978). Thus, the sole question before the Court is whether the Government has proven the voluntary nature of these non-custodial statements.

The primary focus of the voluntariness inquiry is whether there has been police overreaching. *United States v. Bernal–Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010). The Court looks to the totality of the circumstances to determine whether a confession was voluntary, "including the details of the interrogation and the defendant's characteristics." *Id.* Ultimately, the question is whether the defendant "made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him." *United States v. Rouco*, 765 F.2d 983, 993 (11th Cir.1985) (citation and quotations omitted). Among the non-exclusive factors to consider are the Defendant's education and intelligence, length of detention, length of questioning, the use of coercive interrogation techniques and whether Defendant was advised of his constitutional rights. *Id.*

In this case, the agents approached the Defendant at her residence, and the agents informed her that she was not under arrest and that they were not there to arrest her.  Weighing against a finding of voluntariness, the agents never specifically told Plaintiff that she could decline to speak to them.  Nor did the agents in so many words expressly ask the Defendant if she would agree to speak

with them. Rather, the agents approached her at her house, identified themselves, indicated that they were investigating activity that was occurring at Autry prison and (at the :30 mark) stated "we just have a few things we want to ask you about." It would have been much better practice for the agents to have worded this introduction in the form of a question, e.g., "*Can we* ask you some questions?" But this is not the game show Jeopardy!, and while the agents could have worded their introduction in a better way, there remains no "talismanic" test or semantic incantation necessary for the determination of voluntariness. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973). Rather, the Court is obliged to review the facts as a whole to determine whether the Defendant more likely than not spoke voluntarily.

In weighing all of the facts and circumstances, the undersigned finds in the Government's favor. The recording reflects that the tone, especially of the October 8th interview, was very cordial. The agents did not raise their voices or make threats. Indeed, while the agents suggested on October 8th was that they were investigating potential misconduct at Autry, there was no specific accusation that they believed the Defendant to have participated in that misconduct. The Defendant in response spoke clearly and with apparent understanding of what was going on. She did not appear hesitant, reluctant or resistant to speaking. The nature of her statements on October 8th was to generally confirm that she was

aware prisoners offered bribes to prison employees, that there was a corruption problem at Autry involving more than just guards, but that she did not take any payments. The agents in the October 8th interview did not confront or accuse the Defendant of lying, but rather gave the impression of simply interviewing a potential witness as to whom they did not know was involved in criminal activity or not.

At the inception of the October 8th interview, as the agents approached her in the driveway, asked if she would prefer to speak inside of her home, and she indicated that she did. They did not order her inside or suggest that she had to invite them inside. The recording reflects one of the agents (at around the 1 minute mark) simply asking, "would you like to go inside," and suggesting, "that might be easier." While the Defendant had her kindergarten-age child with her, the agents appeared to be respectful of the child, and apparently allowed the Defendant to set the child up watching a television show during the interview. The agents had no visible firearms and were wearing casual clothing. The interview lasted only around 25 minutes.

The tone of the November 9th interview was also polite, but more confrontational because by that point the agents specifically told the Defendant that they had obtained evidence showing her receipt of payments. Even then, however, the agents made clear that she was not under arrest. And the interview involved

few substantive statements by Defendant because after the agents confronted her with evidence of receiving money, she expressly declined to speak any further with them. They repeatedly followed up with the suggestion that she might "help herself" by explaining, but she just as repeatedly refused and expressly declined to speak. Thus, the interaction lasted less than eight minutes.

It is very probative that as soon as the interview went "south"–when the agents on November 9 started confronting the Defendant with evidence contradicting her previous exculpatory statements–the Defendant unhesitatingly and expressly declined to keep talking. The agents seemed to implore her to reconsider her decision to stop the interview, but she clearly stood up to them, and insisted that she would speak no more. This is strong evidence that Defendant understood her right not to speak. *See United States v. Bushay*, 859 F.Supp.2d 1335, 1348 (N.D.Ga. 2012) ("[T]he fact that Bushay exercised his right to stop answering questions during the interview demonstrated that he recognized that he had a choice not to answer any questions.")[1] It also suggests that her earlier exculpatory denials of participation in corruption were made voluntarily, perhaps

---

[1] Indeed, according to the recording of the arrest on January 21, 2016, the Defendant told the agents (at approximately the 1:05-1:10 minute marker), "I don't want to talk. I have a right not to speak," and the agents agreed. This occurred right at the inception of the arrest, as the agents were placing the Defendant in the car, and prior to any furnishment of *Miranda* warnings. In other words, the Defendant already knew independently of *Miranda* warnings that she had the right to decline to speak, as her conduct demonstrated on November 9th.

with the calculated hope that she might deflect the investigation away from herself. Indeed, a defendant's offer of exculpatory denials raises fewer questions as to voluntariness. One may logically question why a suspect who is aware of her right to remain silent and is subject to no coercion might voluntarily incriminate herself. But it is not nearly as difficult to see why such a suspect may choose to answer questions with self-serving exculpatory denials.

The Defendant's refusal to speak on November 9th, combined with the otherwise generally cordial tone of the interviews, the agents' clear assurance that they were not there to arrest her, the location of the interview in Defendant's own home, the agents' non-coercive suggestion "would you like to go inside [the home]? It might be easier," the short duration of the questioning, and the Defendant's cooperative responses, all demonstrate voluntariness. *See, e.g., United States v. Emanuel*, 440 Fed.Appx. 881, 884-85 (Sept. 21, 2011) (finding that the prosecution proved defendant's voluntary consent to search, where "Emanuel invited the officers inside and cooperatively responded to their questions and requests. Emanuel was not threatened, coerced, restrained, handcuffed, patted down, required to answer questions, physically intimidated, or promised leniency. Although the officers were armed, they never removed their weapons from the holsters. The overall tone of the interview was 'cordial,' 'conversational,' and 'very laid back.'")

### B.     The Post-Arrest Statements

On January 21, 2016, Defendant was arrested at her home and transported via car for the approximately three hour trip to the U.S. Courthouse in Atlanta. Defendant points out that *Miranda* warnings were not furnished until several minutes into the arrest. Based on the recording, the agents read the Defendant those rights at approximately the eight minute mark. Defendant does not argue that the agents failed to fully advise her of her rights, questioned her in violation of any invocation of her rights, or that any statements she made after the furnishment of her rights should be suppressed on grounds of an involuntary waiver. Rather, Defendant argues that "any statements made by the Defendant *prior* to the recitation of her Miranda warnings (while she was in custody) must be suppressed." [532] at 2 (emphasis added).

Miranda warnings are not required for all police encounters with citizens, however, but only when police interrogate a suspect who is in custody. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). It is undisputed that Defendant was in custody as of January 21, 2016. But not all questions or statements by law enforcement to an arrestee constitute *interrogation*. "The term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an

incriminating response from the suspect." *Id.* at 301.  Defendant bears the burden of establishing that she was subjected to interrogation in violation of *Miranda*. *de la Fuente*, 548 F. 2d at 533.

Even though it is her burden, Defendant makes no particularized argument and points the Court to no facts to establish that she was subjected to pre-*Miranda* custodial interrogation.  The motion is due for denial on this ground alone. Nevertheless, the Court has reviewed the eight minutes on the recording prior to the furnishment of *Miranda* rights on January 21, and finds nothing that rises to the level of interrogation.  The agents simply informed the Defendant of the charges and that they would be driving her to Atlanta for presentment in Court.  This does not constitute interrogation.  *See Innis*, 446 U.S. at 301 (informing a suspect of the reasons for arrest is 'normally attendant to arrest and custody' and is therefore excluded from the definition of 'interrogation.'); *See Enoch v. Gramley*, 70 F.3d 1490, 1500 (7th Cir.1995) ("Briefly reciting to a suspect in custody the basis for holding him, without more, cannot be the functional equivalent of interrogation."); *United States v. Payne*, 954 F.2d 199, 202 (4th Cir.1992) ("the *Innis* definition of interrogation is not so broad as to capture within Miranda's reach all declaratory statements made by police officers concerning the nature of the charges against the suspect and the evidence relating to those charges."); *United States v. Crisco*, 725 F.2d 1228, 1232 (9th Cir.1984) (merely explaining to a suspect why he is being

arrested does not constitute interrogation).

The remainder of those few minutes consisted largely of conversation about loosening and changing the position of Defendant's shackles, and questions about whether she would need to use the bathroom and whether she needed breakfast. Indeed, after Defendant asserted that she did not want to speak and that she had the right not to speak, the agent simply agreed with her. And the agent told her that he had no intention of asking her any questions about the case during the trip. Therefore, the Court finds no interrogation during the eight minutes prior to the furnishment of *Miranda* warnings.

It is not clear whether Defendant also argues that her statements on January 21st were involuntary pursuant to *Jackson v. Denno*, 378 U.S. 368. Such an argument–if one was intended–is easily rejected. The Defendant repeatedly and forcefully told the agents herself upon being placed into the car that she did not wish to speak, that she would not speak with them, and that she knew she had the right to decline to speak. The agent politely and in a calm tone, agreed with her, and confirmed that she did not have to speak with them at all, and that they did not intend to ask her any questions. Nevertheless, a few minutes later, the agent still furnished Defendant her *Miranda* warnings, re-stating to her that she had the right to remain silent. In the eight minutes prior to the furnishment of *Miranda* warnings, the agents displayed a calm and cordial tone; they very quickly pulled

over to loosen her shackles at her request, within approximately two minutes of the arrest[2]; they told her to let them know if she needed anything including the need to stop for the bathroom; they asked her whether she needed breakfast, to which she responded, "that would be kind;" they discussed with her that they would look for a McDonalds or someplace similar as soon as they reached the interstate; and they made clear to her that she was being brought to Court.[3] This evidence–combined with the Defendant's demonstrated willingness and capability of refusing to speak back on November 9th–strongly supports the voluntariness of any statements.

\* \* \* \*

The record shows, by a preponderance of the evidence, that Defendant's statements to the agents on October 8th, 2015, November 9th, 2015, and January

---

[2] The recording reflects the agent asking the Defendant–at approximately the four minute mark–whether she wanted the handcuffs moved to the front of her body or to remain behind her. She responded that she did not care so long as they were loosened. The agents apparently loosened the shackles but left them behind her back at least at that time. The agent testified that they left the handcuffs behind Defendant's back until they reached Cordele–where they stopped for breakfast and a restroom break–because Defendant had indicated she did not care where the handcuffs were located and because she would not agree to calm down. *See* [516] at 29. After the stop in Cordele, Plaintiff agreed to calm down for the remainder of the trip and the agents moved the handcuffs to the front. *Id.*

[3] The Court offers this ruling based on the testimony and the Court's *sua sponte* review of the first eight minutes of the recording of the January 2017 encounter. Because the recording totals more than three hours, and because the Defendant does not point the Court to any specific portion of this voluminous recording ,the Court declines to *sua sponte* listen to the entirety.

21st, 2016, were voluntarily-made. Defendant does not sustain her burden to show–and the record clearly refutes–that she was subjected to pre-*Miranda* custodial interrogation on January 21, 2016. Thus, Defendant's Motion to Suppress [355] should be **DENIED**.

## CONCLUSION

The undersigned **RECOMMENDS** that Defendant's Motion to Suppress Statements [355] be **DENIED**.

As there is nothing else before the undersigned relating to this Defendant, the Court **CERTIFIES** that this case is **READY FOR TRIAL**.

**IT IS SO ORDERED** this 6th day of October, 2016.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE